# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

MICHAEL L. AMES, #408348                 *

Plaintiff                                *

v.                                       *      Civil Action No. JKB-16-191

CPL. WARREN G. MALLOW,                   *
SGT. JANET M. PUFFENBARGER,
WARDEN FRANK B. BISHOP,                   *

Defendants                               *
                                        ***

## MEMORANDUM OPINION

Pending is Michael Ames's complaint filed pursuant to 42 U.S.C. § 1983.  ECF No. 1.

Corporal Warren G. Mallow, Sergeant Janet M. Puffenbarger, and Warden Frank B. Bishop, by

their attorneys, have filed a motion to dismiss for failure to state a claim or, in the alternative,

motion for summary judgment (ECF No. 23), to which Ames replied.[1]  ECF No. 28.  No hearing

is necessary.  *See* Local Rule 105.6 (D. Md. 2016).  For the reasons stated below, the court will

grant defendants' motion.  ECF No. 23.  The claims against Puffenbarger and Bishop will be

dismissed.  Summary judgment will be granted in favor of Mallow.  The court declines to assert

supplemental jurisdiction over Ames's state law claims.

## BACKGROUND

Michael Ames is an inmate at North Branch Correctional Institution ("NBCI") in

Cumberland, Maryland.  He submitted a complaint in the form of an affidavit, claiming that on

October 28, 2015, Mallow, a member of the NBCI correctional staff, "viciously with force

slammed" the cell door feed slot on his hand.  ECF 1-1 at p. 3. ¶ 17.  Ames claims his wrist and

---

[1]  Ames filed his affidavit in reply.  ECF No. 28.  However, the affidavit is largely, if not entirely, unresponsive to defendants' dispositive motion.  Ames later attempted to file a request for discovery, which does not appear relevant to issues in this case.  ECF No. 35.

hand were bleeding and Mallow denied him medical care.  *Id.* ¶ 19.  Ames states Officer Durst arrived "to see what the commotion was" and observed Ames's right arm/hand pinned in the slot. ECF No. 1 at p. 3, ¶ 19.  Officer Rounds arrived and told Ames that he would escort him to the medical room if he removed his hand form the feed slot.  *Id.* at ¶ 20.  Ames then removed his "injured hand."  *Id.*  Rounds escorted Ames to the medical room and photographs were taken of Ames.  *Id.* ¶ 20.  Ames claims that he suffered several cuts, his hand and wrist swelled, he lost feeling for days, and he suffered severe pain.  *Id.* ¶ 30.  Later in the complaint, Ames alleges Mallow slammed his hand and wrist in the slot, told him to remove his hand from the slot, and slammed the metal slot again on his already bleeding and injured hand.  *Id.* at ¶¶ 25, 26.

Ames faults Sergeant Janet Puffenbarger for "on numerous occasions" ignoring his complaints against Mallow and other officers.  *Id.*  Ames claims that Warden Bishop refuses to properly investigate inmate complaints and, as a "direct result," Ames was assaulted.  *Id.* ¶¶ 23, 28, 29.  Ames claims Defendants' conduct violated his rights under the Eighth Amendment to the United States Constitution as well as Maryland state law, and seeks declaratory and injunctive relief.  He also seeks compensatory damages of $100,000.00 against Mallow, $25,000.00 against Puffenbarger, and $50,000.00 against Bishop as well as punitive damages against Mallow, Puffenbarger, and Bishop in the amounts of $150,000.00, $50,000.00, and $75,000.00, respectively.  ECF No. 1 at 5.

In support of the complaint, Ames submitted affidavits from inmates Dominick Simmons, #422-791, John Wagner, #371-133, and Anthony Cohen, #194-438.  ECF 1-1 at pp. 4-10.  Wagner states that on October 28, 2015, he heard Mallow tell Ames that he was not going to get a meal that day.  Wagner states that he heard Ames say "give me my tray" and then heard the sound of the metal slot closing and Ames scream about his hand and his wrist.  ECF 1-1 at p. 5,

¶ 5.   Wagner states he could hear the slide opening and closing.  *Id.*¶¶ 5, 7. [2]   Wagner states that Ames left a trail of blood behind him on the tier and yelled in pain when he was escorted to the medical room.  *Id*. at p. 6 ¶ 8.   Simmons states he saw Mallow slam Ames's hand in the metal feed slot twice.  ECF No. 1-1 at 8.   Anthony Cohen states that Mallow slammed Ames's hand in the feed slot as he attempted to grab his lunch and Ames yelled out in pain.  *Id*. at 9.   According to Cohen, Mallow stated that "he didn't give a fuck now grab your tray bitch."  *Id*.   Cohen states "Ames could not move his hand until he received medical attention (which was bleeding) [*sic*]" and Ames requested a supervisor to take pictures and his statement, which was denied.  ECF 1-1 at 9.[3]   Cohen claims Officer Durst[4] returned to Ames's cell and saw Ames's hand and wrist trapped in the slot bleeding and did nothing to remove Ames's hand or relieve his suffering.  *Id*. at 10.[5]

In the "Facts" section of the complaint, Ames describes events that allegedly occurred on the previous day, October 27, 2015, but he raises no specific claims based on these events.  ECF No. 1 at pp. 2-3.   Ames seemingly presents these allegations to provide context to his claim.[6]   Ames alleges that on October 27, 2015, he had "words" with Mallow, after which Mallow instructed another prisoner to harm him by stating "Shit Ames' Big Mouth Ass Down and I'll take care of you and I'll back you up."  ECF No. 1 at 2 ¶ 8.   Ames alleges Mallow arranged for another inmate to squirt a liquid concoction of feces on him later that day.  *Id*. ¶ 10.   Ames also

---

[2]   None of these inmates asserts he actually witnessed the incident.  ECF 1-1 at pp. 4-10.

[3]   Ames acknowledges he was taken to the medical unit and photographed after the incident.  ECF 1 at 3 ¶¶ 20, 21.

[4]   Durst is not a defendant in this case.

[5]   Ames submitted a second declaration from inmate John Wagner.  Wagner's declaration, however, addresses matters that are not relevant to the alleged use of force incident on October 28, 2015.  ECF 1-1.

[6]   If Ames intends to raise claims based on these allegations, he must first exhaust his available administrative remedies.  *See* 42 U.S.C. §1997e(a); *Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008).   Defendants observe that Ames has not filed any ARP concerning events alleged to have occurred on October 27, 2015.  ECF No. 23-1 at p. 2.

claims Mallow denied him a meal and taunted him.  ECF No. 1 ¶¶ 10, 11.  The court recognizes

that Ames is a self-represented litigant and his pleadings must be accorded liberal construction.

*See e.g., Erickson v. Pardus*, 551 U.S. 89, 94 (2007).  Accordingly, these assertions shall also be

considered.

## STANDARD OF REVIEW

### I.      Motion to Dismiss

A complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to

relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell*

*Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Facial plausibility exists "when the

plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678.  An inference of a mere

possibility of misconduct is not sufficient to support a plausible claim.  *Id*. at 679.  The Supreme

Court in *Twombly* stated, "Factual allegations must be enough to raise a right to relief above the

speculative level."  550 U.S. at 555.  "A pleading that offers 'labels and conclusions' or 'a

formulaic recitation of the elements of a cause of action will not do.'...Nor does a complaint

suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556

U.S. at 678 (quoting *Twombly*, 550 U.S. at 555, 557).  Although when considering a motion to

dismiss a court must accept as true all factual allegations in the complaint, this principle does not

apply to legal conclusions couched as factual allegations.  *Twombly*, 550 U.S. at 555.  The claims

against defendants Puffenbarger and Bishop will be reviewed under this standard.

### II.     Motion for Summary Judgment

Defendants assert they are entitled to dismissal or summary judgment in their favor on

several grounds, including lack of exhaustion and there is no genuine dispute as to any material

4

fact.  Summary judgment is proper when the moving party demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations ..., admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a), (c)(1)(A); *see Baldwin v. City of Greensboro*, 714 F.3d 828, 833 (4th Cir. 2013).  If the party seeking summary judgment demonstrates that there is no evidence to support the nonmoving party's case, the burden shifts to the nonmoving party to identify evidence that shows a genuine dispute exists as to material facts. *See Celotex v. Catrett*, 477 U.S. 317 (1986).  The existence of only a "scintilla of evidence" is not enough to defeat a motion for summary judgment.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 251–52 (1986).  Instead, the evidentiary materials submitted must show facts from which the finder of fact reasonably could find for the party opposing summary judgment.  *Id*.  "In ruling on a motion for summary judgment, this Court reviews the facts and all reasonable inferences in the light most favorable to the nonmoving party."  *Downing v. Baltimore City Bd. of School Comm'rs*, Civ. No. RDB 12-1047, 2015 WL 1186430, at *1 (D. Md. Mar. 13, 2015) (citing *Scott v. Harris*, 550 U.S. 372, 378 (2007)).

Defendants have filed copies of verified documents and declarations with their pleadings. The court may consider a wider range of documents when it treats a motion to dismiss as a motion for summary judgment, which it may do pursuant to Rule 12(d).  *See Syncrude Canada Ltd. v. Highland Consulting Group, Inc.,* 916 F. Supp. 2d 620, 623 (D. Md. 2013).  When the court does so, "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."  Fed. R. Civ. P. 12(d).  Notably, "the Federal Rules do not prescribe that any particular notice be given before a Rule 12 motion is converted to a Rule 56 motion."

*Ridgell v. Astrue*, Civ. No. DKC-10-3280, 2012 WL 707008, at *7 (D. Md. Mar. 2, 2012). Thus, this requirement "can be satisfied when a party is 'aware that material outside the pleadings is before the court.'" *Walker v. Univ. of Md. Med. Sys. Corp.*, Civ. No. CCB-12-3151, 2013 WL 2370442, at *3 (D. Md. May 30, 2013) (quoting *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985)). Though the Court "clearly has an obligation to notify parties regarding any court-instituted changes in the pending proceedings, [it] does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998). Here, defendants designate their motion as a "motion to dismiss or, in the alternative, motion for summary judgment." Ames was provided the opportunity to dispute these exhibits with verified exhibits and affidavits. ECF No. 24. Thus, the Court deems it appropriate to review the claims against Mallow in the context of a motion for summary judgment.

## DEFENDANTS' RESPONSE

In October of 2015, Ames was incarcerated in disciplinary segregation in Housing Unit 1. Inmates on disciplinary status have meals brought them because they are not allowed to leave their housing units. ECF No. 23-2 (Mallow decl.). Inmate meals are passed on a tray through the "feed slot," a rectangular opening in the middle of the cell door, which is secured by a sliding door, sometimes called a "slider," which usually opens left to right. ECF No. 23-3 (Werner decl.). The slider is locked and unlocked with a key that is placed in a lock located near the side of the feed slot. As the slider pulls closed, the key locks into place and the slider cannot be pulled back open, unless the officer stops and manipulates the key again. The edge of the slider has "teeth" which run against the grooves along the edge of the feed slot. Neither the teeth nor the grooves are exposed in order to minimize risk of injury. The design provides security measures so that an inmate cannot force the slot open. Some cells have a small box covering the

feed slot for additional security.  The box is secured with a latch and must be opened and pulled down.  The food tray is placed in the box as the food passes through the slot.  After the inmate receives his food, the slot is closed for security reasons.  ECF No. 23-3.  Ames's cell was equipped with a security box on the feed slot.  ECF 23-2.

Mallow states that on October 28, 2015, at approximately 9:30 a.m., he was distributing meals on Housing Unit 1.  ECF 23-2 at p. 6 (Mallow decl); ECF 23-6 (Information Report Form).  Because Ames was disruptive and threatening to staff, Mallow placed the food tray into the security slot, but did not immediately open the slot due to Ames's "hysteria."  ECF 23-6. Mallow asked Ames to calm down and said that he would return to give him his meal in ten minutes after he finished passing out and collecting the trays of other inmates on the tier.  Ames agreed.  Upon returning to Ames's cell, Mallow opened the slider.  Ames said he no longer wanted the food tray so Mallow proceeded to close the security slot.  When the slider was almost closed, Ames shoved his arm out.  Mallow states he stopped the slider when it was just short of striking Ames's arm.  *Id*.  Mallow ordered Ames to remove his arm and hand, but Ames refused and wanted the officer in charge.  Mallow then called Officer D. Rounds, Sr., to bring a security barrier to the cell.  Before the barrier was placed, Ames stated, "you assaulted me, I got you all now."  *Id*.  Mallow checked and observed no marks or injuries on Ames's arm.  Once the barrier was set in front of the cell, Mallow told Ames he would give him another chance to close the slot after he calmed down.  *Id*.  In his declaration, Mallow attests:  "At no time did I purposely shut the sliding door on Mr. Ames or on his arm."  ECF 23-2 ¶ 6.

Officer Rounds states that when he arrived at Ames's cell, he observed Ames's right hand was wrapped around a drinking cup and he was refusing to remove his arm from the slot and take his meal.  ECF 23-6 at 34.  Rounds saw no injury to Ames's right arm that was

breaching the slot until several minutes later, after he retrieved the barricade. ECF No. 23-6. Rounds states at no time did he see Mallow slam or shut the sliding feed slot door onto Ames's arm. A few minutes later, Rounds returned to Ames's cell during routine checks on the tier. Rounds noticed that Ames had calmed and had a small cut on his hand. Rounds states he does not know when Ames received the cut, as several minutes had passed from the time he placed the barrier. Rounds then escorted Ames to the medical department for treatment. Ames was also photographed. ECF 23-4.[7]

In the medical department, Michele Junkins, LPN, noted Ames had an abrasion on his right forearm that measured approximately ½ inch in diameter but was not bleeding. Junkins cleaned the abrasion and applied bacitracin and a bandage. ECF 23-5 at p. 4. No other injuries were noted. Ames went to the medical department several times over the next three weeks, but presented no complaints concerning his right forearm. ECF 23-5 at pp. 5-14.[8]

Mallow wrote a Notice of Inmate Rule Violation based on the October 28, 2015, incident, charging Ames with violating Rules 116 (misuse of security equipment), 312 (interfering with staff duties), and 400 (disobeying an order). ECF 23-2 at 3. At the disciplinary hearing on November 3, 2014, the hearing officer considered these charges as well as from two other incidents. The first of these incidents occurred on October 27, 2015. *Id.* at pp. 7-8, 14-20. Ames was charged with violating rules 102 (assaulting an inmate) and 400 (disobeying an order) for squirting another inmate, Dominick Simmons, with urine and feces from a lotion bottle while both inmates were in recreational cages. After the inmates refused orders to stop, Mallow used

---

[7] The abrasion is not apparent on the black and white copies of the photographs taken after the incident. ECF 23-6 at pp. 34, 36-39.

[8] Ames's complaint was accompanied by a copy of a sick call request he dated October 29, 2015, complaining of pain in his right hand. ECF 1-1 at 13. On November 1, 2015, Ames was seen in the medical department complaining of right wrist pain. Ames told the nurse that his palm was sore when he closed his hand. The nurse found his right hand moved easily and instructed him to return if he did not have any improvement when using Motrin. ECF 23-5.

pepper spray to end the assault. *Id*; *see also* ECF No. 23-2 at p. 25 (Use of Force Report). The second incident occurred on October 28, 2015, at 7:30 a.m. when Ames flushed water out from under his cell door on to the tier. When Sgt. Puffenbarger went to Ames's cell and attempted to calm him, Ames started yelling, "I'll kill all you bitches." ECF 23-2 at 11; ECF 23-6 at 8. Based on this incident, Ames was charged with violating rules 100 (engaging in a disruptive act), 104 (using intimidating or threatening language), and 312 (interfering with or resisting the performance of staff duties). ECF No. 23-2 at p. 11. Ames pleaded guilty at his disciplinary hearing to violating Rules 102 and 104. *Id*. at pp. 16-23. In exchange for the plea, NBCI merged the sentences for all three incidents. *Id.* Ames was sanctioned with 180 days of disciplinary segregation and 30 days of cell restriction. *Id*. at pp. 14, 15

The Internal Investigation Division ("IID") assigned Detective Kandace Mills to investigate Ames's claim that he was assaulted by Mallow on October 28, 2015. ECF No. 23-6. On November 4, 2015, Mills conducted interviews with Ames, Mallow, Rounds, Officer Durst, and inmate Jonathan Anderson. Mills's investigation included reviewing the surveillance recording of the tier taken at the time of the incident, photographs taken of Ames on October 28, 2015, after the cell slot incident, and the medical report. After investigation, Mills concluded the evidence was insufficient to substantiate Ames's claims. *Id.*

During his interview, Ames told Mills that Mallow would not feed him, but instead told him that he would receive his lunch in a brown bag. Ames said the tier was protesting because Mallow was not feeding him. ECF 23-6 at p. 9. Ames told the IID investigator that Mallow put the tray in the slot. Ames said that when he reached for his juice, Mallow slammed the slot closed on his *left arm*.[9] (Emphasis added). Ames said his arm remained in the slot for about 10 minutes until Officers Durst and Rounds came to the cell. Rounds opened the slot a little and

---

[9]   The Court notes Ames's medical records show the abrasion was on Ames's right forearm. ECF No. 23-5 at p. 4.

Ames pulled his arm out.  Ames said after he pulled his arm from the slot, Rounds placed the security barrier on his door.  *Id*.  Ames told the IID investigator that fellow inmate Anderson witnessed the incident.  *Id.*

Mills asked Officer Jamey Durst whether he saw Ames's arm in the slot when he and Rounds went to the cell.  Durst replied "no."  ECF 23-6 at p. 9.  Mills interviewed Rounds who stated that he saw Ames's arm in the slot when he and Durst went to the cell.  Rounds saw Ames's hand was around the juice, but the slot was not against his arm at all.  ECF 23-6 at 10.

Mills next interviewed Mallow.  Mallow informed her that Ames's behavior had been poor just before the incident.  Ames had thrown urine at another inmate on the day before the incident and had threatened Puffenbarger on the morning of the incident.  Mallow said he placed Ames's tray in the slot but didn't open it because Ames was irate.  Mallow told Ames that when he calmed, he would give him his tray.  When he returned, Ames told him that he did not want his tray.  Mallow started to shut the slot, and Ames quickly placed his arm out of the slot. Mallow said he saw him and was able to stop the slot before it struck his arm.  Mallow denied shutting the slot on Ames's arm or assaulting him.  *Id*.  Mallow stated Ames could have put both arms out with as much room as there was in the opened slot.  *Id*. at p. 10.  Mallow did not see an injury to Ames's arm at the time.  Mills asked Mallow whether he was going to give Ames a brown bag lunch, and Mallow responded, "Yes, I told him that if he didn't calm down, he was going to get a brown bag."  *Id.*

Inmate Jonathan Anderson told Mills that he witnessed the incident from his cell which was next to Ames.  Anderson said Mallow did not give Ames his tray right away.  Mallow put it in the slot but did not open it until he had collected other inmate trays.  Anderson heard Mallow tell Ames that he was going to get a bagged lunch because he did not want feces thrown on him.

Ames said he wanted his tray.  Anderson said he saw Mallow open the slot and Ames grab for his juice, but Mallow shut his arm in the slot.  *Id.* at p. 11.  Anderson said he did not hear Mallow say anything when the slot closed.  *Id.* at 10-11.  In her investigation report, Mills noted the discrepancy between Ames's written statement, which claimed Mallow said "Fuck you" after he closed the slot on Ames's arm, *id.* at 12; *see* 23-6 at 34 (Ames's statement), and the fact that neither Ames nor Anderson mentioned this statement during their interviews.  ECF No. 23-6 at p. 12.

Mills reviewed the surveillance video and determined it was of no evidentiary value because the incident was not captured or visible.  ECF No. 23-6 at p. 12.[10]  Mills stated visibility was "terrible" because the camera lens appeared to be cloudy.  *Id.*  Mills stated the video showed that at approximately 0933 hours, an officer appearing to be Mallow opened cell slots and then exited the tier.  At approximately 0950, officers appeared to be placing a shield in front of a cell door.  The video ended at 1000 hours.  *Id.*

Ames filed an administrative remedy procedure (ARP) request NBCI-2262-15 concerning the October 28, 2015, incident.  ECF 1-1 at p. 11.  The ARP did not address events that are alleged to have occurred on October 27, 2015.  *Id.*  Ames's ARP was procedurally dismissed because the incident was under investigation by the IID.  Ames appealed the disposition by filing a grievance before the Inmate Grievance Office ("IGO"); it was administratively dismissed on May 19, 2016.  ECF 23-7 at p. 1.

---

[10]  A copy of the surveillance video was shown to Ames.  ECF No. 32.  The court viewed a copy of the video (ECF No. 33) and has concluded it is of no evidentiary value in determining the issues in this case.

## DISCUSSION

### I.        Claims Against Puffenbarger and Bishop

Defendants Puffenbarger and Bishop seek dismissal of the claims against them for failure to state a claim.  In order for liability to exist under §1983, there must be personal involvement by a defendant in the alleged violation.  *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977); *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994); *see also Rizzo v. Goode*, 423 U.S. 362, 370–71 (1976).  Vicarious liability based on respondeat superior is generally inapplicable to § 1983 actions.  Ames does not allege either Puffenbarger or Bishop was involved personally in the door slot incident.  Instead, Ames faults Puffenbarger and Bishop based on their supervisory roles.  He avers that Puffenbarger has ignored previous inmate complaints against Mallow and by doing so is responsible for the alleged October 28, 2015, assault.  Similarly, Ames claims Bishop was placed on notice of Mallow's conduct by other inmates, but failed to properly investigate those complaints.  Ames does not expressly state a cause of action against either defendant.  In both instances, Mallow provides no specific facts to support his allegations.

Supervisory liability under § 1983 must be supported with evidence that (1) the supervisor had actual or constructive knowledge his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.  *See Shaw*, 13 F.3d at 799.  Even if Ames identified a cognizable cause of action, which he does not, Ames's general and conclusional assertions are insufficient to satisfy the requisites for establishing supervisory liability.  For these reasons, the complaint fails

to state a claim upon which relief may be granted, and the claims against Puffenbarger and Bishop will be dismissed with prejudice.

## II.        Claims against Mallow

Ames claims that Mallow's actions on October 28, 2015, constituted use of excessive force in violation of his rights under the Eighth Amendment.

### A.  Use of Force

A convicted inmate's claim of use of excessive physical force is examined in the context of the Eighth Amendment's prohibition against cruel and unusual punishment. *See Whitley v. Albers*, 475 U.S. 312, 319–21 (1986); *see also Hudson v. McMillan*, 503 U.S. 1, 7–9 (1992). Eighth Amendment analysis asks whether the prison officials "acted with a sufficiently culpable state of mind (subjective component) and whether the deprivation suffered or injury inflicted on the inmate was sufficiently serious (objective component)." *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996).  In a claim for excessive application of force, a claimant must meet a heavy burden to satisfy the subjective component—that correctional officers applied force "maliciously and sadistically for the very purpose of causing harm," rather than "in a good-faith effort to maintain or restore discipline." *Whitley*, 475 U.S. at 320–21 (internal quotation marks omitted). To satisfy the subjective component, a claimant must show that a prison official acted with a "sufficiently culpable state of mind." *Wilson v. Seiter*, 501 U.S. 294, 297 (1991).

In determining whether prison officials have acted maliciously and sadistically, a court should balance 1) the need for the application of force; 2) the relationship between the need and the amount of force used; 3) the threat reasonably perceived by the responsible officials, and; 4) "any efforts made to temper the severity of a forceful response." *Whitley*, 475 U.S. at 321.

Not every malevolent touch by a prison guard, later determined in the calm of a judge's chambers to be gratuitous, gives rise to a federal cause of action. *See Hudson*, 503 U.S. 1, 6 (1992). In *Wilkins v. Gaddy*, 559 U.S. 34 (2010), the Supreme Court stated: "This is not to say the 'absence of serious injury' is irrelevant to the Eighth Amendment inquiry." 559 U.S. at 37 (quoting *Hudson v. McMillian*, 503 U.S. 1, 7 (1992)). But, it is a factor in applying and reviewing the Eighth Amendment analysis. *Id*. Thus, a court must look at "the nature of the force rather than the extent of the injury." *Wilkins*, 559 U.S. at 34.

In this case, Ames falls short of demonstrating an Eighth Amendment claim. Regarding whether Mallow had "a sufficiently culpable state of mind," Ames's allegations and exhibits conflict with each other. Further, Ames fails to demonstrate that the only injury documented by a medical provider, a small abrasion to his forearm, was sufficiently serious to support a claim of constitutional moment.

Ames's complaint provides conflicting accounts of the incident. Ames first claims in the complaint that Mallow slammed the feed slot into his hand and wrist once, pinning him in the slot. ECF No. 1 at 3 ¶¶ 17, 19. Officers Rounds and Durst arrived, and Ames was taken to the medical unit. ECF No. 1 at 3 ¶¶ 19, 20. Ames claims that Rounds told him that if he removed his hand from the slot, then he would be escorted to the medical office. *Id.* ¶ 20. Later in the complaint, Ames changes his description of the incident to allege that Mallow slammed the feed slot on his hand and wrist, demanded Ames remove his hand from the slot, and then slammed the slot on Ames's hand again**.** ECF No. 1 at 4 ¶¶ 26, 27. Not only are the two accounts inconsistent, but Mallow, by his counsel, notes that the officer would have had to unlock the slider with the key, then pull the slider open as the teeth of the slider ran along the grooves of the slot, and then shut the slot on Ames's arm again. ECF No. 23-1 at 14.

Notable too are inconsistencies between the accounts Ames and Anderson, the inmate who witnessed the incident from the next cell, provide.  Ames told IID investigator Mills that prisoners on the tier began to protest and cause a disturbance because Mallow did not give Ames his meal.  ECF No. 23-6 at p. 9, 35 ECF No. 1-1 at 2 ¶ 13.  Anderson denied there was loud yelling on the tier.  ECF No. 23-6 at p. 11.  Anderson told Mills that he "was the only one taking up for [Ames]."  *Id.*  There are also discrepancies in the written statement Ames made after the incident, the complaint, and Anderson's statement to the IID investigator.  Ames wrote in his statement that Mallow closed the slot on his arm and yelled "Fuck you," which presumably could suggest malicious or sadistic intent.  ECF No. 23-6 at p. 35.  Anderson, however, told the IID investigator that Mallow did not threaten Ames or say anything when he shut the slot.  ECF 23-6 at pp. 11, 12.  Ames does not allege in the complaint that Mallow yelled "Fuck you" or mention this significant detail during his IID interview.

Also, Ames told the IID investigator during his interview on November 4, 2015, only one week after the incident, that the slot closed on his left arm (ECF No. 23-6 at p. 9), whereas the abrasion identified by the medical provider was on Ames's right arm.  ECF No. 23-5 at p. 4.

Most telling are the incongruities between Ames's description of his injuries and the findings contained in the uncontroverted medical report.  The medical report notes only a small abrasion on Ames's right forearm and it was not bleeding.  There is no indication the abrasion was serious, painful, or anything other than superficial.  The medical report noted no injury to Ames's hands or wrist.  As such, the report fails to substantiate Ames's claims that he suffered hand and wrist injuries caused by Mallow's vicious and forceful slamming of a metal slot door against him.  The superficial nature of the small abrasion belies suggestion of the sadistic or malicious use of force calculated to cause harm.  The medical report also dispels inmate John

15

Wagner's allegation that as Ames was escorted to the medical room, Ames's bleeding left a trail behind him on the tier.  ECF No. 1-1 at p. 6 ¶ 6.  The medical report finding also contradicts inmate Anthony Cohen's allegation that Ames's hand and wrist were bleeding.  ECF No. 1-1 at pp. 9-10.  None of the officers initially at the scene observed injury to Ames.  ECF No. 23-6 at 34; ECF No. 23-4.  Only after Rounds returned from checking on other tiers did he observe the abrasion, which defendants in their dispositive motion suggest may have been self-inflicted injury or may have occurred after the barrier was placed outside Ames's cell door.

Mallow denies closing the slot on Ames and attests he was able to stop the slot before it hit Ames's arm.  Mallow told the IID investigator Ames could have put both arms out with as much room as there was in the slot.  ECF No. 23-6 at p. 10.  Rounds said he observed Ames's hand was wrapped around the drinking cup, he refused to remove his hand, and the slot was not against his arm at all.  ECF No. 23-6 at 10.  Rounds did not see Ames's hand, wrist, or arm stuck or pinned in the slot.  Officer Durst did not see Ames's arm stuck in the slot at all.  Mallow states Ames had sufficient space to move his arm in and out of the slot.

Significant portions of Ames's claims are contradicted by his complaint, his own averments, and exhibits he has placed in the record.   Further, Mallow's affirmations are supported with exhibits.  Thus, Ames fails to show a constitutional violation.  When parties offer differing versions of the events in affidavits or sworn pleadings, and the differences involve genuine issues of material fact, summary judgment is precluded.   Credibility generally cannot be judged on the pleadings, although if a party alleges facts that are blatantly contradicted by the record, the court should not rely on the party's factual allegations in ruling on summary judgment.  *Scott v. Harris*, 550 U.S. at 380; *see also Smith v. Ozmint*, 578 F.3d 246, 254 (4th Cir. 2009) ("Although the undersigned does not make a credibility determination, '[w]hen opposing

parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.'") (citing *Scott* 550 U.S.at 380). *Accord Solomon v. Felker*, No. 08-cv-2544, 2015 WL 1469165, at "7 (E.D. Calif. Mar. 27, 2015) ("The factual context of plaintiff's claim of excessive force is implausible because the injuries described in plaintiff's medical records do not support his claim that he was beaten."); *Lanier v. Smith*, No. 3:08-cv-833, 2009 WL 3853170, at *8 (M.D. Fla. Nov. 18, 2009) (stating that "the medical evidence is consistent with the amount of force Defendants allege they used to restrain Plaintiff and restore order and is inconsistent with Plaintiff's allegations" in his verified complaint).

### B. Medical Care

Ames alleges that Mallow violated his rights under the Eighth Amendment by failing to secure medical care for him. To state a claim for denial of medical care in violation of the Eighth Amendment, a plaintiff "must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 105 (1976). Ames does not dispute that he was taken to the medical unit by Rounds after he came to check on him during routine tier rounds. While the parties dispute when and how Ames sustained the abrasion to his forearm, even if it occurred as Ames claims in either of the two versions of the incident he alleges in the complaint, he was escorted to the medical room shortly afterward for treatment of a small, superficial injury. The small abrasion was a minor injury and does not rise to the level of a serious medical need. *See, e.g.*, *Martin v. Gentile*, 849 F. 2d 863, 871 (4th. Cir. 1988) (injury that was not bleeding and did not require sutures or pain killers, such as a glass splinter in the hand, not a serious medical need). Ames does not show that Mallow acted with deliberate indifference to Ames's medical need. Ames's claim does not support an Eighth

Amendment claim for denial of medical care, and Mallow is entitled to summary judgment as to this claim.

In light of these determinations, the court declines to exercise supplemental jurisdiction over Ames's state law claims.

## CONCLUSION

For the reasons stated in this memorandum opinion, the court will grant defendants' motion to dismiss or, in the alternative, for summary judgment.  ECF No. 23.  The court will dismiss the claims arising from the October 28, 2015, incident against defendants Puffenbarger and Bishop with prejudice.  The court will grant summary judgment in favor of defendant Mallow as to the claims based on the October 28, 2015, incident.  A separate order follows this memorandum opinion.

March 2, 2017                                       _____/s/_____
Date                                                   James K. Bredar